CASE No. 791.

REYNOLDS v. WITTE.

1. Where money of a principal was lent by his agents and the notes of the borrower were secured by a deposit of negotiable collaterals which were fraudulently misappropriated by the agents, the principal is responsible for their value.
2. A principal is civilly responsible for the fraudulent act of his agent, where the act is done in the course of the agency, and by virtue of the authority as agent.
3. The borrower having offered to pay the notes at their maturity, the principal is liable for the market value of the collaterals at that date.

Before KERSHAW, J., Charleston, November, 1878.

This was a controversy without action between Mark Reynolds and C. O. White. The facts agreed upon state neither more nor less than is sufficient for a proper understanding of the case. They are as follows :

FACTS.—1. The plaintiff is a planter, residing on his plantation in Sumter county, and the defendant resides in Charleston county.

2. The plaintiff having as his factors and agents in the city of Charleston the firm of J. M. Caldwell & Sons, sent to them, in the year 1869, certain sums of money to be invested by them for him.

3. J. M. Caldwell & Sons, acting as agents for the plaintiff,

lent this money to defendant, and took from him notes with collateral security.

The notes were renewed from time to time. The last were in the words and figures following:

"$1000.               CHARLESTON, S. C., December 3d, 1874.

"Twelve months after date, I promise to pay to Dr. M. Reynolds, or order, one thousand dollars, with interest at the rate of ten per cent. per annum, I having deposited against this note two bonds of the city of Memphis, guaranteed by the Memphis and Charleston railroad, for $1000 each.

"Nos. 1283, 1054.
    "(Signed,)                    CHAS. O. WITTE."

"CHARLESTON, S. C., May 20th, 1875.

"Twelve months after date, I promise to pay to Dr. M. Reynolds, or his order, three thousand dollars for value received, and interest at the rate of eight per cent. per annum, payable quarterly.

"Against payment of this note I have delivered to Messrs. J. M. Caldwell & Sons, his agents, the following bonds as collateral security: three bonds city of Savannah, six per cent., $500 each; two bonds city of Memphis, six per cent., guaranteed by Memphis and Charleston railroad, $1000 each; two bonds city of Savannah, seven per cent., one $500 and one $1000. All of which I authorize him, or his agents, James M. Caldwell & Sons, to sell in case of non-payment of this my note at maturity.

    "(Signed,)                    CHAS. O. WITTE."

"CHARLESTON, S. C., May 23d, 1875.

"Twelve months after date, I promise to pay to the order of Messrs. James M. Caldwell & Sons, against the surrender of $4000 city of Savannah bonds delivered by me as collateral security, three thousand dollars, and interest at the rate of eight per centum per annum, payable quarterly, for value received.

"$3000.
    "(Signed,)                    CHAS. O. WITTE."

4. The defendant, when the loan was first made and the first notes were given, delivered to J. M. Caldwell & Sons the bonds specified in the notes above copied.

5. The bonds were coupon bonds not yet due, and payable to bearer.

6. Defendant paid the interest regularly on the notes to J. M. Caldwell & Sons, and when he desired to collect the coupons on the pledged bonds, obtained the coupons from J. M. Caldwell & Sons for that purpose.

7. The bonds remained in the possession of J. M. Caldwell & Sons during the life of J. M. Caldwell, the senior partner; and after his death continued in possession of his son and son-in-law, who continued the business in the same firm name, and remained the agents of plaintiff, collecting the interest on these notes.

8. Defendant became desirous of paying his notes, and offered to do so at maturity, whereupon it was discovered that J. M. Caldwell & Sons had, sometime previous thereto, fraudulently pledged the said bonds, and raised money on them. The bonds will not pay the debt for which they are pledged. J. M. Caldwell & Sons are bankrupt.

9. The former firm of J. M. Caldwell & Sons bore an excellent reputation; up to the time of the discovery of this transaction the character of the new firm was good.

At the date of the maturity of the notes the bonds were worth, say, city of Savannah bonds, eighty-five cents; Memphis city bonds, thirty cents.

When the suit was commenced they were worth, city of Savannah bonds, sixty-five cents; Memphis city bonds, thirty cents.

At the present time they are worth, city of Savannah bonds, fifty-nine cents; Memphis city bonds, thirty-six and a half cents.

10. The notes being past due, the plaintiff demanded payment from the defendant.

11. The defendant refuses payment unless the plaintiff will contemporaneously therewith deliver to him the bonds which were left as collateral security for the notes, or account to him for their value.

QUESTIONS.—I. Under these circumstances, is the plaintiff liable to the defendant for the value of the collaterals given to secure the payment of said notes?

II. If this be answered in the affirmative, at what date should this valuation be made; at the maturing of the notes, or at the beginning of this suit, or at the rendition of the judgment?

### DECREE.

. This case is submitted to me upon an agreed statement of facts under the provisions of Section 389 of the code of procedure.

The case of *Scott, Williams & Co.* v. *Crews*, 2 *S. C.* 533, recognizes the doctrine laid down in all the authorities, that the plaintiff in this case is chargeable on the pledge of the securities of the defendant only as the bailee of a pledge, and in this species of bailment all that can be required of the bailee is ordinary care and diligence. "A pledge," says the court, "is made on a consideration which promises gain to the bailor and the bailee. The one obtains the use of the money borrowed, and the other procures a security for that which he has loaned. Hence, in regard to the mutual advantage incident to the bailment, the bailee, in the preservation of the articles pledged, is only liable for ordinary negligence, because nothing is required of him beyond ordinary diligence."

The law does not require that the pledgee should retain custody of the pledge. He may deliver it to a stranger for safe keeping. *Story on Bail.*, § 324; *Tally* v. *Freedman's Sav. Bank,* 93 *U. S.* 325.

In the exercise of the diligence required of the bailee in this case, the employment of an agent in the care of the property was necessary. The securities pledged were coupon bonds payable to bearer, the title to which passes by delivery. It would have been negligence on the part of Dr. Reynolds to have kept them in the country house where he resides, and where they would have been exposed to risk of loss from robbery or destruction by fire. The agreed statements of facts show that it was in the contemplation of all the parties to this transaction that the securities should remain in the hands of Caldwell & Sons.

They had been in the custody of that firm, with the knowledge of the defendant and without objection on his part, from the year 1869, when the loan was first made, down to the last renewal of the notes in 1875—a period of over five years.

When the employment of an agent in the care of the property is necessary, the principal will not be liable for loss, if he exercises due care in the choice of an agent. 2 *Parsons on Cont.* 110.

In this case, negligence on the part of the plaintiff has not been alleged. On the contrary, it is conceded that up to the time when the misappropriation of these securities was discovered, the character of the agents employed by the plaintiff had been unexceptionable.

The sole question in this case is whether the plaintiff is liable for the willful misappropriation of the defendant's securities by his agents, in the absence of all fault on his part. The law seems to be well settled, that while the principal is liable for the negligence of his servant, he is not liable for the criminal acts willfully committed by him, such acts not being within the scope of his authority. *Story on Bail.*, §§ 87, 407; *Foster* v. *Essex Bank*, 17 *Mass.* 479; *Gibblin* v. *McMullin*, 2 *Priv. Council* 338.

I am, therefore, of opinion, that under the statement of facts, as agreed upon and submitted to me, the plaintiff is not liable for the loss of the defendant's collaterals.

It is, therefore, ordered that judgment be entered against the defendant in the sum of $9156.17, with costs, and that the plaintiff have execution therefor.

The defendant appealed to the Supreme Court from this decision of the Circuit judge.

*Messrs. Simonton & Barker*, for appellant.

The Circuit judge has overlooked the peculiar phraseology of the note of May 23d, 1875—*against the surrender*, &c. Here the obligation to pay is dependent upon the surrender of the bonds.

The precise question presented in this case has never been decided, so far as we can find. In *Scott & Co.* v. *Crews*, 2 *S. C.* 522, the act was not committed by the agents of the depositor. In *Foster* v. *Essex Bank*, 17 *Mass.* 479, the bailment was gratuitous,

the subject matter never entered into the business of the bank, and was not under the control of the officer who stole it. So, also, in *Scott* v. *Bank*, 72 *Penna.* 471. See *Bank* v. *Boyd*, 44 *Md.* 47, (22 *Am. R.* 40), and the comments on *Foster* v. *Essex Bank* in *Morse on Banking* 65. The Circuit decision puts the plaintiff in the position of a bailee, and holding him to the responsibility of a bailee for ordinary care, excuses him. He is not responsible, because, contrary to reasonable expectation, his agent proved to be a fraud. What is ordinary care in a bailee will depend on the nature of the subject matter of the bailment. 60 *N. Y.* 278. Caldwell & Sons were not bankers, nor were they agents of a security company. They were cotton factors and commission merchants. Plaintiff's right of possession during the currency of these notes, was absolute. Reynolds had a large power of disposition over these bonds. He could have pledged them to another, and such person could hold them under such pledge, even against the first owner. *Story on Bail.*, § 324; 3 *Otto* 325.

We submit that the true view is that Caldwell & Sons held as agents of the plaintiff, and that when they used them as they did they acted in the course of their employment as such agents, and within the scope of the authority with which the conduct of the plaintiff had clothed them. The whole business was managed through these agents, and plaintiff knew of the negotiability of the bonds and of their possession by Caldwell & Sons. He is responsible for their act, although he did not authorize it. In the language of Benjamin, Q. C., 9 *Moak* 210, the Circuit judge "has failed to distinguish between the authority to commit a fraudulent act, and the authority to transact the business, in the course of which the fraudulent act was committed." In our case the action of the agents was the result of the powers with which plaintiff had clothed them, and he is responsible. *Story on Agency,* § 452; 1 *Bl. Com.* 432; 40 *N. Y.* 453; 25 *N. Y.* 596.

Now what is the scope of the authority of the agent? It can only be measured by his apparent authority, and parties dealing with him may reasonably conclude that the control which he exercises in and about the subject matter of the agency, is the extent of the authority. 15 *East* 43; 6 *Rich.* 497; 10 *Rich.*

337; 11 *Rich. Eq.* 344; 46 *N. Y.* 325; 7 *C. B.* (*N. S.*) 400; 7 *H. & N.* 603; 2 *H. & C.* 175.

When defendant parted with his collaterals, he lost, for the time, all control over them. *Story on Bail.*, § 311; *L. R.*, 1 *Q. B.* 618. Plaintiff should have preserved them for us, but he placed them in such position as made their loss possible. He certainly could not recover them from the purchasers from his agents. The loss is thus traced directly to the action of Reynolds. His act not only deprived us of the security which those bonds gave, but it has also left us without remedy as against the present holders of the bonds.

*Mr. S. Lord*, for respondent.

The plaintiff and defendant stood to each other in the relation of pledgor and pledgee. The general property remains in the bailor; only a special property passes to the bailee.. Non-payment of debt, when due, does not, of itself, work a forfeiture. 12 *Johns.* 147; 4 *Denio* 227; 2 *Caines' Cas.* 200. This rule applies to negotiable securities as well as to any other kind of property.

The pledgee impliedly stipulates that he will take ordinary care of the things pledged. He is not bound for the exactest care and diligence required of a borrower, and he is liable for a greater degree of care than the law exacts of a depositary without reward. *Edw. on Bail.*, § 234. He is not liable for loss by fire or theft, if kept with ordinary diligence. 2 *Kent* 580, 581; 2 *Ld. Raym.* 909; 58 *Me.* 275; 34 *Md.* 235; 62 *Penna. St.* 47; *Edw. on Bail.* 236; 2 *Barb.* 326; 9 *Wend.* 268. These principles are recognized and applied in 2 *S. C.* 522.

Attention has been called to the peculiar phraseology of one of the notes. "Words alone should not be permitted to govern and destroy the design and intent." 2 *S. C.* 457. In construing a contract, the court will look to the motives and the object. 2 *Gill. & J.* 382. It is manifest here that the object was to pledge the bonds for the payment of the note, and that the expressions are unusual; used by one not familiar with our language. Certainly plaintiff's agents had no authority to make him an insurer

against loss. 58 *Me.* 276 ; 56 *Me.* 121 ; *W. Jones* 179 ; *Chitty on Cont.* 735, *note i.*

As pawnee, plaintiff might employ agent to keep collaterals for him. 93 *U. S.* 324 ; *Story on Bail.,* §§ 324–327. In this case it was proper for him to commit their custody to an agent, using reasonable care in the selection. 2 *Parsons on Cont.* 110, *note t.* It is conceded that the agents had always borne excellent reputation. Defendant shared in this confidence, and authorized the agents to sell his bonds if he defaulted in his payment. It was in contemplation of both parties that Caldwell & Sons should retain the collaterals for the mutual convenience of both parties. They were really the agents of both parties. *Edw. on Bail.,* § 50 ; 38 *Me.* 55 ; 8 *Allen* 512 ; 6 *Cal.* 643.

We come to the discussion of the only question in the case on which doubts can be entertained. The loss was occasioned by the fraud or felony of Caldwell & Sons, and the point, then, is narrowed to this consideration—whether the plaintiff is answerable, in law, for the fraudulent conversion by his agents of the defendant's securities. It is now a well-established rule that masters are responsible for injuries done by the *negligence* of their servants, while acting within the scope of their employment, but never for injuries *willfully* committed, where they have other purposes than executing their masters' orders ; unless the masters were guilty of negligence in appointing the servants or in the particular act. *Story on Agency,* § 456 ; *Story on Bail.,* § 402 ; 1 *Esp.* 315 ; 1 *East* 106 ; 17 *Mass.* 479 ; *Law R.,* 2 *P. C.* 317 ; 99 *Mass.* 605 ; 19 *Ohio St.* 110 ; 70 *Penna. St.* 119. The only difference here is, that it was not a gratuitous bailment, but that is unimportant, since the question is as to the liability of the principal in the absence of all negligence, on his part, for the fraud of his agent. The master is only liable for the willful act of his servant, where the servant acts in ignorance of facts, (*Edw. on Bail.,* § 391,) and where there has been subsequent ratification. 13 *Mees. & W.* 834 ; *Cro. Eliz.* 824 ; 2 *N. Y.* 479 ; 1 *Bl. Com.* 429.

There is no pretence of express authority given by plaintiff to do this wrong, or of any subsequent assent or knowledge. The

wrong done was wholly outside the limits of the agency. 8 *Ad..* *& E.* 512 ; 6 *T. R.* 659.

It should not be forgotten that defendant knew of the risks he assumed when he selected for his collaterals negotiable securities. Plaintiff probably knew nothing of the kind of security he had taken.

January 7th, 1880. The opinion of the court was delivered by

McGowan, A. J. This case was submitted on Circuit upon an agreed statement of facts, under the provisions of Section 389 of the code of procedure, which is a part of the record and need not be re-stated here. The statement submitted contains copies of the notes sued on, a description of the bonds pledged by the defendant as collateral security for his notes, as well as the value of said bonds at three different periods of time—at the maturity of the notes, at the time when the suit was brought and at the rendition of the judgment. Under the circumstances stated, two questions are submitted for the judgment of the court:

*First.* Is the plaintiff liable for the value of the collaterals given to secure the payment of said notes ?

*Second.* If this be decided in the affirmative, at what date should their valuation be made—at the maturity of the notes, the beginning of the suit, or the rendition of the judgment?

The Circuit judge decided the first question in the negative, which disposed also of the second, and gave judgment for the plaintiff for the whole amount of his notes, principal and interest, exonerating him from all accountability for the loss of defendant's collaterals by the fraudulent appropriation of his agents. The defendant alleges error in that judgment and appeals to this conrt.

The three notes of plaintiff upon which judgment has been rendered are not identical in form, and it is insisted that the same principles of law as to the proposed set-off of the collaterals may not apply to all of them. Two of the notes are made payable to the plaintiff, Reynolds, and the other to " the order of Messrs. James M. Caldwell & Sons," styled agents of Reynolds. Each of the notes in its terms differs somewhat from the

others; but it is manifest that the intention in all was the same—to pledge the bonds described as collateral security for the notes respectively, and, from the view taken by the court, it is unnecessary to consider the particulars in which they differ from each other.

The bonds were coupon bonds, payable to bearer. The title was transferable by mere delivery, and when Caldwell & Sons, having legal possession, transferred them to innocent *bona fide* holders, they were gone beyond the reach of either Reynolds or Witte; so far as the true owner is concerned, and for all the purposes of this case, they were destroyed by the fraudulent act of Caldwell & Sons. *Gourdin* v. *Reid,* 6 *Rich.* 497; *Carmichael* v. *Buck,* 10 *Rich.* 337; *State Bank* v. *Cox,* 11 *Rich. Eq.* 344; *McNeil* v. *Tenth National Bank,* 46 *N. Y.* 325; *Swan* v. *North British Australian Company,* 7 *Hurlst. & Nor.* 603.

Caldwell & Sons are now bankrupt, and the question is upon whom the loss of the collaterals must fall—upon Witte, who owned them and pledged them to Reynolds to secure his debt to him, or upon Reynolds, whose agents fraudulently appropriated them. The case presents an example of double agency. As to the collaterals, Reynolds was the agent of Witte of that class known as bailee, and Caldwell & Sons were the agents, factors, of Reynolds. The question of the liability of Reynolds to Witte must be determined either by his own acts or those of his agents for which he is properly responsible. The judgment below exonerates Reynolds from all responsibility in the first place, upon the ground that he did no act himself which should charge him with the loss of the bonds; that, as bailee of a pledge, his only duty was to take proper care of the property pledged, which he claims to have done; that in the transaction of the business, and the proper care of the bonds, it was necessary to appoint an agent, and, having selected agents, then of good character, and entrusted the bonds to them, he was in no way liable for their subsequent acts; that the one act of appointing agents of good character at that time was the discharge of his whole duty in the matter. The facts submitted do not show that this was one of those cases in which the agency of a third party was *so necessary* that the principal must be excused from all responsibility for the acts of

the agent after his appointment, provided only he used proper care in the appointment. The transaction was simply one of lending money—taking notes therefor and collaterals to secure them. That might have been done by Reynolds in person as well as by his agents. Nor is it perceived that agents were *necessary* for the safe keeping of the collaterals. That does not appear to have been the purpose of Reynolds. The result has shown that in all probability they would have been as safe in Sumter county in the possession of Reynolds as in the city of Charleston in the possession of Caldwell & Sons. The agency was not necessary, but simply convenient.

There is nothing to distinguish this from the ordinary case where one, for convenience, employs another to act as his agent in a particular business, or to exempt Reynolds and Caldwell & Sons from the principles which ordinarily attach to the relation of principal and agent. Of all these principles there is not one more important than that which makes the act of the agent, within the scope of his authority, the act of the principal—"*qui facit per alium, facit per se.*" Caldwell & Sons were the agents of Reynolds, and they misappropriated, and thereby, for the purpose of this case, destroyed the collaterals of Witte. Is Reynolds liable for that act? If Reynolds himself had done the act there can be no doubt that he would have been liable to Witte. Then what is his responsibility when not done by himself, but by his agents? Must the result to Witte be different for the reason that Reynolds chose to perform his part of the business through agents selected by himself? If Caldwell & Sons as the agents of Reynolds had lost these collaterals by *negligence merely*, if they had left their safe unlocked and in consequence the bonds had been stolen, it is conceded that. Reynolds would have been liable; but it is insisted that he should not be held liable for the loss occasioned by their "*criminal act willfully committed.*"

The Circuit judge says: "The only question in the case is whether the plaintiff is liable for the willful misappropriation of the defendant's securities by his agent in the absence of all fault on his part. The law seems to be well settled that whilst the principal is liable for the negligence of his agent, he is not liable

for the criminal acts willfully committed by him—such acts not being within the scope of his agency."

It may be true that, generally, the principal is not liable *criminally* for the acts of his agent done without his authority, nor *civilly* to third persons with whom he has no privity for his willful trespasses.

This is not a *criminal* but a *civil* claim to charge Reynolds with the value of the collateral appropriated by Caldwell & Sons. It is difficult to understand upon what ground the principal should be held liable for the *negligence* of his agent and not for his *fraud*, where the act is done or omitted to be done to the very property as to which the agency exists and in the course of the agency. Fraud by which the property is lost is generally considered one of the forms of gross negligence. What is the proper understanding of the phrase "within the scope of the agency?" Does "the scope" include negligence and exclude fraud? It cannot properly be restricted to what the parties intended in the creation of the agency, for that would also exclude negligence, as no agent is appointed for the purpose of being negligent, any more than for the purpose of acting fraudulently. The question cannot be determined by the authority intended to be conferred by the principal. We must distinguish between the authority to commit a fraudulent act and the authority to transact the business in the course of which the fraudulent act was committed. Tested by reference to the intention of the principal, neither negligence nor fraud is within "the scope of the agency;" but tested by the connection of the act with the property and business of the agency, *fraud* in taking the very property is as much "within the scope of the agency" as negligence in allowing others to take it. The proper inquiry is, *whether the act was done in the course of the agency and by virtue of the authority as agent.* If it was, then the principal is responsible, whether the act was merely negligent or fraudulent. Here the fraudulent act was the appropriation of the very property of the agency—without which agency they would not have had possession of the property and could not have done the act.

We have not had our attention directed to any decided case precisely in point, nor have we been able to find one, but the

principles announced by eminent judges and elementary writers fully cover the point.

In the case of *Scott, Williams & Co.* v. *Joseph Crews,* 2 *S. C.* 522, the defendant, Crews, borrowed money from the plaintiffs, bankers, gave them notes for the money, and secured them by pledging as collateral bills of the bank of the state. These bills were not fraudulently appropriated by the bank, but were taken from its vaults by robbery. The question was simply one of negligence as bailees, and upon that issue the plaintiffs were held not liable.

The case of *Foster et al., Executors,* v. *President .and Directors of the Essex Bank,* 17 *Mass.* 478, comes much nearer the precise point involved· here. A special deposit of $50,000 of gold was made, which was stolen by the cashier and the chief clerk of the bank. The corporation was exonerated from responsibility, upon the grounds that it was a gratuitous deposit without compensation, but for safe keeping merely, and the theft was not the act of the corporation, but the unauthorized act of the cashier and clerk, outside of their business as officers, and therefore as mere strangers. The whole case shows that if the corporation, through its proper officers and as its own act, had fraudulently appropriated the money, the court would have held them liable. Chief Justice Parker, in delivering the judgment of the court, states the principle as well as its qualifications. He says : " It was contended by one of the counsel for the plaintiff, as a proposition universally true, that the principal is civilly answerable for all frauds done by his agents ; and he is supported in the use of this language by a doctrine of Lord Kenyon, in the case of *Doe* v. *Martin ;* and also by Lord Ellenborough in 1 *Camp.* 127, and yet it must strike the mind of every man of sense that this universal proposition will admit of, and, indeed, upon principles of common sense, actually requires qualifications. No one will suppose, if my servant commits a fraud relative to a subject that does not concern his duty to me, that I shall be civilly answerable for such fraud. If I send him to market and he steps into a shop and steals, or, upon false pretences, cheats the shop-keeper of his goods, I think that all mankind would agree that I am not answerable for the goods he may thus unlawfully acquire. *The*

B

*proposition can be true only when the agent or servant is, while committing the fraud, acting in the business of his principal or master."*

In Story on Bailments, it is said : " But good faith alone is not sufficient. If there is any loss occasioned by their negligence or mistake or inadvertence, which might fairly have been guarded against by ordinary diligence, they will be held responsible therefor ; *and, a fortiori, they will be held responsible when they are guilty of any misfeasance."*

In Smith's Mercantile Law it is said : " The principal has been thought to be responsible, not merely for the negligence, but for the deliberate fraud of his agent committed in the execution of his employment, though without the principal's authority, as, for instance, by selling false jewels for true ones." The reason given for this by Lord C. J. Holt, appears a sensible one. " Seeing," says he, " that some one must be loser by the deceit, it is more reasonable that he who employs and confides in the deceiver, should be the loser than a stranger. Such, certainly, was the opinion of the Roman lawyers."

The principle is well stated in Story on Agency, Section 452 : " It is a general doctrine of law that, although the principal is not ordinarily liable (for he sometimes is) in a criminal suit for the acts or misdeeds of his agent, unless, indeed, he has authorized or co-operated in them, yet he is held liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, negligences and other malfeasances, misfeasances and omissions of duty of his agent, *in the course of his employment,* although the principal did not authorize or justify or participate in, or indeed know of such misconduct, or even if he forbade the acts or disapproved of them. In all such cases the rule applies *respondeat superior;* and it is founded upon public policy and convenience, for in no other way could there be any safety to third persons in their dealings, either directly with the principal or indirectly with him, through the instrumentality of agents. In every such case the principal holds out his agent as competent and fit to be trusted, and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency."

1. The first question submitted is decided in the affirmative.

2. As to the second question, it is adjudged that the valuation of the collaterals be made at the time of the maturity of the notes. sued on. At that time the defendant offered to pay the notes and take up his collaterals, and upon his non-delivery of the collaterals upon demand, the obligation of Reynolds became fixed.

The judgment below is reversed and a new trial ordered.

WILLARD, C. J., and McIVER, A. J., concurred.