Parker, C. J.
This is assumpsit, to recover of the defendants the value of certain gold, deposited by the plaintiffs’ testator in the bank of which the defendants are * the [ * 49? ] proprietors; and the facts, upon which the action is founded, are established by a special verdict, found by the jury who tried the issue.
Those facts are multifarious, and present several important ques tians of law, which have been investigated by the counsel with all the research and ability, which novelty in their application to a subject of so general concern as banks seemed to demand. No case has, however, been produced on either side, so apposite as to relieve the Court from an inquiry into the general principles, on which the action is founded; and after all the pains, which other public engagements have allowed us to bestow on this particular case, no authorities have been discovered, having an essential bearing upon it, which had escaped the diligence of the counsel employed in the argument.
The public importance of the questions has induced us to delay forming a conclusive opinion, while there was any room to suppose we might be mistaken ; and doubts, which have, until a late period, prevailed with one or other of us, owing to want of time for examination, rather than to any intrinsic difficulty in the case, have occasioned repeated revisions of the arguments of counsel, and frequent recurrence to the authorities cited. Our minds are now definitively settled; and we hope to be able to show that the result we have come to is supported by the best approved principles of the common law, and conformable to decisions, ancient and modern, in analogous cases. In attempting to do this, we shall consider,
1st. Whether the bank made any contract with the plaintiffs* testator.
2dly. What is the nature of that contract.
*404 3dly. Whether it has been violated.
1. On the first point we have had little difficulty. For, notwithstanding the act of incorporation gives no particular authority or power to receive special deposits; and although the verdict finds that there was no regulation or by-law relative to such [ * 498 ] deposits, or any account of them * required to be kept and laid before the directors or the company, or any practice of examining them; yet as it is found that the bank, from the time of its incorporation, has received money and other valuable things in this way; and as the practice was known to the directors, and we think must be presumed to have been known to 'the company, as far as a corporation can be affected with knowledge ; and as the building and vaults of the company were allowed to be used for this purpose, and their officers employed in . receiving into custody the things deposited; the corporation must be considered the depositary, and not the cashier or other officer, through whose particular agency commodities may have been received into the bank.
No authorities are necessary to support this position. It rests upon common and familiar principles. The master and owner of a house or warehouse, allowing his servants or clerks to receive for custody the goods of another, and especially if the practice be general and unlimited, as is the case with banks in relation to special deposits, will be considered the bailee of the goods so received, and will incur the duties and liabilities belonging to that relation. Not so, if the servant, secretly and without the knowledge, express or implied, of the master, he not having authorized or submitted to the practice, receives the goods for such purpose; for no man can be made the bailee of another’s property, without his consent; and there must be a contract, express or implied, to induce a liability. The knowledge and permission, expressly found or legally to be presumed in this case, establishes a contract between the parties. And this brings us to the consideration of the second point, viz.,
2dly. The nature and legal qualities of this contract. It will not be disputed, that, if it amounts only to a naked bailment, without reward, and without any special undertaking, which, in the civil and common law, is called deposition, the bailee will be answerable only for gross negligence, which is considered equivalent to a [ * 499 ] breach of faith; * as every one, who receives the goods of another in deposit, impliedly stipulates that he will take some degree of care of it. The degree of care, which is necessary to avoid the imputation of bad faith, is measured by the carefulness which the depositary uses towards his own property of a similar kind. For although that may be so slight, as to a nount *405 even to carelessness in another; yet the depositor has no reason to expect a change of character, in favor of his particular interest; and it is his own folly to trust one, who is not able, or willing, to superintend with diligence his own concerns.
This principle, although denied by Lord Coke, as in 1 Inst. 89, b., has been received as the law regulating gratuitous bailment, as it is sometimes called, or mere deposit, where there is no advantage but to the depositor, from the luminous opinion of Lord Holt in the celebrated case of Coggs vs. Bernard, down to the profound and brilliant treatise of Sir William Jones, in which, with a wonderful mixture of learned research and classical illustration, he has analyzed the complicated contract of bailment; and applied the principles of moral philosophy, the doctrines of the civil law, and the usages of all nations, ancient and modern, to the different branches of this diversified subject, so as to leave little room for speculation, except as to the application of his rules to particular cases, as they arise.
The dictum of Lord Coke, that the bare acceptance of goods to keep implies a promise to keep them safely, so that the depositary will be liable for loss by stealth or accident, is entirely exploded; and Sir W. Jones insists that such a harsh principle cannot be inferred from Southcote’s case (36), on which Lord Coke relied; the judgment in that case, as the modern civilian thinks, being founded upon the particular state of the pleadings, from which it might be inferred, either that there was a special contract to keep safely, or gross negligence in the depositary. But as the judges Gawdy and Clench, who alone decided * that cause, said [ * 500 ] that the plaintiff ought to recover, because it was not a special bailment, by which the defendant accepted to keep them as his own proper goods, and not otherwise (37) ; the inference which Lord Coke drew from the decision, that a promise to keep implied a promise to keep safely, even at the peril of thieves, was by no means unwarranted. But the decision, as well as the dictum of Lord Coke in his Commentary, were fully and explicitly overruled by all the judges, in the case of Coggs vs. Bernard, and upon the most sound principles. It is so considered in Hargrave and Butler’s note to Co. Lit. n. 78, and all the cases since have adopted the principle, that a mere depositary, without any special undertaking, and without reward, is answerable for the loss of the goods only in case of gross negligence; which, as is every where observed, bears so near a resemblance to fraud, as to be equivalent to it in its effect upon contracts.
*406 Indeed the old doctrine, as stated in Southcote’s case, and by Lord CoJce, has been so entirely reversed by the more modern decisions, that, instead of a presumption arising from a mere bailment, that the party undertook to keep safely; and was therefore chargeable, unless he proved a special agreement to keep only as lie would his own; the bailor, if he would recover, must, in addition to the mere bailment alleged and proved, prove a special undertaking to keep the goods safely (38) ; and even then, according to Sir William Jones, the depositary is liable only in case of ordinary neglect, which is such as would not be suffered by men of common prudence and discretion; so that if goods deposited with one who engaged to keep them safely were stolen, without the fault of the bailee, he having taken all reasonable precautions to render them safe, the loss would fall upon the owner, and not the bailee. And Sir William Blackstone, in his Commentary, recognizes the same principle; for he says, “ If a friend delivers any thing to his friend to be kept for him, the receiver is bound to restore it on [ * 501 ] demand; and it was formerly *held that in the mean time he was answerable for any damage or loss it might sustain, whether by accident or otherwise; unless he expressly undertook to keep them only with the same care as his own goods, and then he should not be answerable for theft or other accidents. But now the law seems to be settled, that such a general bailment will not charge the bailee with any loss, unless it happens by gross neglect, which is construed to be an evidence of fraud. But if he undertake specially to keep the goods safely and securely, he is bound to answer all perils and damages, that may befall them for want of the same care, with which a prudent man would keep his own.” 2 Comm. 453. And this certainly is the more reasonable doctrine ; for the common understanding of a promise to keep safely would be, that the party would use due diligence and care to prevent loss or accident; and there is no breach of faith or trust, if, notwithstanding such care, the goods should be spoiled or purloined. Any thing more than this would amount to an insurance of the goods; which cannot be presumed to be intended, unless there be an express agreement, and an adequate consideration therefor.
The doctrine, as thus settled by reason and authority, is applicable to the case of a simple deposit, in which there is an accommodation to the bailor, and the advantage is to him alone. He shall be the loser, unless the person in whom he confided has shown bad *407 faith, in exposing the goods to hazards to which he would not expose his own. This would be crassa negligentia, and for this alone is such a depositary liable.
If we proceed one step further in the gradation of liabilities, we shall discover every legal principle, which can by possibility affect this cause, considered as founded on a contract of bailment. It was urged by the plaintiff’s counsel, that this is not a naked bailment, but is accompanied with an advantage from the use of the property, or the credit derived from the custody of it; and that this * ought to be viewed in the light of a [ * 502 ] reward, so that the case will be brought within the principle of bailment for hire or reward. If it be so, the principle applicable to this species of bailment goes no further than to make the bailee liable in case of ordinary neglect; so that if he shows that he used due care, and nevertheless the goods were stolen, he would be excused. This is the doctrine of Sir William Jones, and was the opinion of Lord Kenyon, in the case of Finnucane vs. Small, cited in the argument; which, though a nisi prius decision, is satisfactory evidence of the law, as two very eminent sergeants acquiesced in his opinion.
And this is also reasonable, for one who takes goods into his warehouse, to keep for a stipulated price, does not intend to insure them against fire or thieves. His compensation is only in the nature of rent; or if any thing beyond that, only for the vigilance of a man of common prudence. If he locks and fastens the warehouse, as other prudent people do, and thieves break through and steal, he ought not to be accountable; if he leave the door or windows open, he ought to be. The common sense of mankind must acquiesce in these reasonable provisions of the law; and without doubt the common dealings of men are governed by them, as principles of natural justice, without a knowledge of the positive law.
Having thus settled satisfactorily to ourselves the principles, by which our judgment in this action is to be guided, we proceed to a consideration of the facts, in order to ascertain under what species of bailment the plaintiffs’ property was committed to the keeping of the defendants. It has been before observed that, as it was received into their building and placed in their vaults by their servants, according to a practice allowed of by them, they must be responsible in some degree; and are bound to restore it, or the value, unless it has been lost by some accident, for which they are not liable by the nature of their contract. We think there is no doubt that on such a deposit an * action of [ * 503 ' trover would lie against the corporation, if they should *408 refuse to deliver the property on demand; and assumpsit might also be maintained, it being settled, by the later authorities, that either action may be maintained against an incorporated company, as well as against a natural person; although the doings, on which the action is founded, are not verified by the seal of the corpora tian. Vide the opinion of Mr. Justice Story, in the case of The Bank of Columbia vs. Patterson’s Adm’r., 7 Crancl, 299, in which all the learning upon the subject of corporate liabilities is exhausted.
Looking into the special verdict, we find the money of the plaintiffs’ testator, contained in a chest which was locked, and the key kept by his agent was received into the bank by W. S. Gray, the cashier, in the presence of W. Orne, who was president of the bank at the time. The money, being gold, was weighed in the presence of the president and cashier, and a memorandum of the different pieces in separate bags taken by the cashier and given to Mr. Bond, the testator’s agent, with this writing signed by Mr. Gray as cashier, viz., “Left at Essex Bank for safe keeping.” The verdict finds that the chest, containing the gold, was left at the bank as a special deposit; that the bank was not authorized to use the money, or treat it otherwise than as a special deposit; that it was kept in the vault of the bank, until it was removed to Haverhill for better security in time of war, with the consent and at the expense of the owner; that after the danger was over, it was brought back and replaced in the vaults of the bank, with the specie belonging to the bank, and there remained until it was pilfered, as afterwards stated in the verdict. Mr. Bond, the agent of the owner, was in the practice of coming to the bank, to look into the vault to see that the money was safe ; but it did not appear that he opened the cask or counted the money. Some of the doubloons were delivered to the agent, on the order of the testator, by the cashier, [ * 504 ] in August, 1817; and at other * times other doubloons were delivered in the same manner on similar orders. At each of these times the cask was opened by the cashier or chief clerk, to deliver the doubloons, pursuant to orders. This was done without the knowledge of any of the directors. They knew nothing of the delivery of the doubloons, nor was any account taken of them in the books of the bank. It is found that no return or statement of special deposits was ever made to the directors by the cashier; and that such deposits are made and taken away without the particular knowledge of the directors, although they know it is the practice so to receive and take them. The directors knew nothing of the nature or amount of this or any other special deposit, unless such knowledge may be presumed from the agency *409 of the president and cashier in receiving this deposit, or of the cashier when he delivered the doubloons pursuant to orders. And it is found not to be the practice of this or any other bank, for the directors to inspect or examine special deposits; and it is considered improper for any officer to do so, without the consent of the depositor.
Upon this state of facts, we think it most manifest that, as far as the bank was concerned, this was a mere naked bailment, for the accommodation of the depositor, and without any advantage to the bank, which can tend to increase its liability beyond the effect of such a contract. No control whatever of the chest, or of the gold contained in it, was left with the bank or its officers. It would have been a breach of trust to have opened the chest, or to inspect its contents. The owner could at any time have withdrawn it, there being no lien for any price of its custody; and it was not thought that the bank had authority to remove it to a place of greater safety, ' without the orders of the owner. If it be possible to constitute a gratuitous bailment, or a simple deposit, this was one; unless the memorandum given by the cashier altered its character, or unless the nature of such a deposit * is such as to [ * 505 ] have given the bank a right to derive profit from it; both of which points have been contended for by the counsel for the plaintiffs.
As to the first of these points, supposing the bank to be answerable for any special undertaking of the cashier, we perceive no evidence of such an undertaking in this case. The writing signed by the cashier is merely a memorandum, signifying that the chest and its contents were left in the bank for safe-keeping. It contains no promise, and assumes no risk, other than would be derived from the mere delivery without any writing. Nor does it receive any additional force from the presence of Mr. Orne, and his certificate of the gold having been weighed in his presence. For in this he did not ac or sign officially; and if he had assumed to do so, it not being within the scope of his authority, as president, to charge the bank with any special liability, his act could not have bound the corporation, who, according to the practice as found by the jury, take no notice of special deposits. And the same may be said of the memorandum signed by the cashier. For if he had undertaken to make the bank specially answerable for a deposit, contrary to its usage and to the nature of the contract implied by accepting such a deposit, such an undertaking, without previous authority or subsequent assent, would have failed to implicate the bank.
We think, also, that there is nothing in the nature of such a da *410 posit, or in the usages of banks, or in the act incorporating the bank, from which any qualities can be attached to this bailment, which do not belong to that class of contracts generally, where the advantage is wholly on the side of the depositor.
It was contended that the bank might discount on this property. But if the true nature of a special deposit is understood by us,—and we think its character is properly described in the special verdict,— we are of opinion this could not be done. For although [ * 506 ] the bank, by implication, are allowed, in * the act of incorporation, to have credit upon the simple amount of all the moneys deposited for safe-keeping, we are satisfied that the legislature had reference to general deposits only in this provision. It does not appear that this or any other bank ever issued notes upon the credit of special deposits ; indeed they could not, as the amount of such deposits, or the value of them, is generally wholly unknown to the directors and the company. The eighth section of the incorporating act, we think, clearly shows that the deposits referred to in the third section are general deposits. For in the eighth section an annual account of the moneys deposited is required to be made to the governor and council, in order that it may be ascertained whether there has been an excessive issue of notes. Now, of special deposits no such account can be rendered, because ■ none is kept; and we have never heard that any bank has been complained of, as violating its charter, for not rendering an account of such deposits.
We see, then, no profit to the bank, arising from special deposits, unless it be, as was suggested, that they acquire an increased credit with the community on their account. But any credit founded upon such deposits would be fallacious, since they cannot be meddled with by any officer of the bank, although authorized by a vote of the corporation, without a breach of trust which would subject them to an action. As to the idea suggested, that the business of a bank may be facilitated and increased by the accommodation given to special depositors, the advantage, if any, is too minute and remote to affect their liability.
Such deposits are indeed simply gratuitous on the part of the bank, and the practice of receiving them must have originated in a willingness to accommodate members of the corporation with a place for their treasures, more secure from fire and thieves than their dwelling-houses or stores ; and this is rendered more probable from the well-known fact, that not only money or bullion, but documents, obligations, certificates of public stocks, wills, and [ * 507 ] other * valuable papers, are frequently, and in some banks as frequently as money, deposited for safe-keeping
*411 This is wholly different from the deposits contemplated in the act on which notes may be issued; for they enter into the capital stock, become the property of the bank as much as their other moneys, and the bank become debtors to the depositors, for the amount.
3dly. The contract in the present ease being then only a general bailment, the third question to be discussed is, whether the contract has been executed by the bank. I use the word bank for the corporation, consisting of the president, directors, and company, for the sake of brevity.
The rule to be applied to this species of bailment is, as has been stated, that the depositary is answerable, in case of loss, for gross negligence only, or fraud which will make a bailee of any character answerable. Gross negligence certainly cannot be inferred from any thing found by the verdict; for the same care was taken of this as of other deposits, and of the property belonging to the bank itself. The want of books, showing the number and amount of deposits, is not a culpable negligence; for the acceptance of the deposit being voluntary, the bank was not obliged to incur any labor or expense in this respect; and besides, the agent of the depositor required nothing but a memorandum from the cashier; and this was more than he could have insisted on as a right.
As to the supposed neglect and carelessness of the directors, in not inspecting the cashier’s accounts more strictly, so as to have detected his fraudulent management of the books to cover his peculation, this concerned the property of the company, not that of special depositors; and the reputation of the cashier, and general confidence in him, found by the verdict, is a sufficient ahswer to any charge of negligence in his original appointment or continuance in office.
We have thus prepared the way for the discussion of the great question in the case, and we believe the only * one on which doubts could be entertained. The loss [ * 508 ] was occasioned by the fraud or felony of two officers of the bank, the cashier and chief clerk. We shall not consider whether the act of taking the money was felonious or only fraudu lent; as the distinction is not important in this case; the question being whether there was gross negligence ; and that fact may appear by suffering goods to be stolen, as well as if they were taken away by fraud. Fraud on property deposited, committed by the depositary, or his servants acting under his authority, express or implied, relative to the subject matter of the fraud, is equivalent to gross negligence, and renders the depositary liable. No fraud is directly imputed to the bank: it being found that the directors, who? *412 represent the company, were wholly ignorant' of the transactions of the cashier and chief clerk in this respect.
The point, then, is narrowed to this consideration, whether the corporation, as bailee, is answerable in law for the depredations committed on the testator’s property by two of its officers; and here, it being thought there was some discrepancy in the authorities, we have felt ourselves obliged to examine minutely all which have been cited, and all others having a bearing on the question.
It was contended by one of the counsel for the plaintiffs, as a proposition universally true, that the principal is civilly answerable for all frauds done by his agents; and he is supported in the use of this language by a doctrine of Lord Kenyon in the case of Doe vs. Martin, and also by Lord Ellenborough in 1 Camp. 127. And yet it must strike the mind of every man of sense, that this universal proposition will admit of, and, indeed, upon principles of common justice, actually requires, considerable qualifications. No one will suppose, if my servant commits a fraud, relative to a subject that does not concern his duty towards me, that I shall be civilly answerable for such fraud. If I send him to market, and he steps into a shop and steals, or upon false pretences cheats [ * 509 ] the shop-keeper of his * goods, I think all mankind would agree that I am not answerable for the goods he may thus unlawfully acquire; and yet the proposition, as stated, will embrace a case of this kind. The proposition can be true only when the agent or servant is, while committing the fraud, acting in the business of his principal or master; and this was the state of things in both the cases which are cited to support the proposition; and they go upon the principle of an implied authority to do the act.
The rule of law is correctly laid down by Sir William Blackstone [1 Comm. 429.], viz., “ that the master is answerable for the act of his servant, if done by his command, either expressly given or implied.” And in another place, “ If a servant by his negligence does any damage to a stranger, the master shall answer for his neglect; but the damage must be done while he is actually employed in his master’s service; otherwise the servant shall answer for his own misbehavior.” [Ibid. 431.] The same rule will apply more strongly to frauds practised by the servant. Christian, in a note to this passage, approves this doctrine, and illustrates it with some observations of his own.
The Supreme Court of the United States recognize the same doctrine in the case of The Mechanic’s Bank vs. The Bank of Columbia, 5 Wheat. 326, in which it is said that the liability of the principal depends upon the facts, 1. That the act was done in the *413 exercise, and, 2. Within the limits, of the powers delegated. Any act, they say, within the scope of the power or confidence reposed in the agent, such as money credited in the books of the teller of a bank, or proved to have been deposited with him although he omits to credit it. And in the case of Ellis vs. Turner & Al., 8 D. & E. 533, Lord Kenyon says, “ The defendants are responsible for the acts of their servant, in those things that respect his duty under them, though they are not answerable for his misconduct in those things that do not respect his duty to them; as if he, being * master of the defendants’ vessel, were to commit an [ * 510 ] assault upon a third person in the course of his voyage.”
And upon the same principle it has been holden, that if a servant wilfully drive his master’s carriage against the carriage of another, the master is not liable for the damages. [1 East, 106.] And the reason is the same; for in such case there is no authority from the master, express or implied ; the servant in that act not being in the employment of his master. In the case here referred to, the master was not in the carriage at the time: the law would have been the same, if he had been present, and had endeavored to prevent the act; the presence of the master being only presumptive evidence of authority.
I think it may be inferred from all this, as a general rule, that to make the master liable for any act of fraud or negligence done by his servant, the act must be done in the course of his employment; and that if he steps out of it to do a wrong, either fraudulently or feloniously, towards another, the master is no more answerable than any stranger. The cases of innholders, common carriers, and perhaps ship-masters or seamen, when goods are embezzled, are exceptions to the general rule, founded on public policy (39).
We are then to inquire whether, in this case, when the gold was taken from the cask by the cashier and clerk, they were in the course of their official employment. Their master, the bank, had no right to meddle with the cask or open it; and so could not lawfully communicate any authority ; and that they did not in fact give any, is found by the verdict. Nor did they in any manner assent to, or have any knowledge of it. There are no circumstances, then, from which such authority can be implied. The chest or cask, when once placed in the vault, was to remain there until taken away by the owner, or ordered away by the bank; either party having a right to discontinue the bailment. It was never opened but by order of the owner, until it was opened *by the officers for a fraudulent or felonious purpose. It [*511] was no more within the duty of the cashier, than of any *414 other officer or person, to know the contents, or to take any account of them. If the cashier had any official duty to perform relating to the subject, it was merely to close the doors of the vault, when banking hours were over; that this, together with other property there, should be secure from theft. He cannot therefore be considered, in any view, as acting within the scope of his employment, when ne committed the villany; and the bank is no more answerable for this act of his, than they would be, if he had stolen the pocket-book of any person, who might have laid it upon the desk, while he was transacting some business at the bank.
If it be asked, for what acts, then, of a cashier or clerk, the bank would be answerable; I should answer, for any which pertain to their official duty; for correct entries in their books, and for a propel .account of general deposits; so that, if by any mistake, or by fraud, in these particulars, any person be injured, he would have a remedy. If they should rob the vaults of the property of the bank1, the company would necessarily lose; as must have happened in this case to a great amount; and if the bank have become debtors tc those who have deposited otherwise than specially, their debts will not be diminished by the fraud; so that in this form they are answerable to depositors; and for the correct conduct of all their servants, in their proper sphere of duty, they are answerable. They may also possibly be answerable for notices to endorsers upon, pills and notes left with them for collection, if there should be a failure, by the neglect of any of their servants; because they have undertaken to give the proper notices. But even in that case it may admit of a question, whether they would be liable any further than attorneys, who undertake the collection of debts, would be. But they are not answerable for special deposits, stolen by [ * 512 ] one of their officers, any more than if * stolen by a stranger; or any more than the owner of a warehouse would be, who permitted his friend to deposit a bale of goods there for safe-keeping, and the goods should be stolen by one of his clerks or servants.
The undertaking of banking corporations, with respect to their officers, is that they shall be skilful and faithful in their employments ; they do not warrant their general honesty and uprightness.
And it is the same with individuals. If a friend commit to my care valuable property to keep for him, and it be stolen by my servants. I shall not be answerable for the loss; as was stated by Lord Kenyon in the case of Finnucane vs. Small. This case, before referred to for another purpose, deserves special notice upon this point; for if it be law, it goes the whole length of the case before us, and even beyond it; for the bailee there received a reward for his custody of *415 the goods, which were stolen. The* plaintiff was an officer in the army, and being about to leave London, sent his trunk to the defendant’s house for safe custody, and was to pay one shilling per week for house-room. When he returned he received the trunk, but the contents had been stolen. Lord Kenyon held the defendant not liable, it appearing that he had taken as much care of the trunk, as he had of his own goods; and that if the goods were stolen by the defendant’s servants, as was stated to have been the fact by the plaintiff’s counsel, it would make no difference. His lordship no doubt considered the hire agreed to be paid, as mere compensation for house-room, not as a reward for diligence and care; and therefore did not require of the defendant more care than he used about his own goods, considering it as a simple deposit only. Whether he was right or not in this, there is no doubt of the correctness of his opinion with respect to the agency of the servants in the theft; for they were not in the course of their duty, when pilfering the trunk of its contents. Garrow and Shepherd, eminent sergeants, and since judges, acquiesced in the opinion.
*This case is, in all respects, like the one before us, [ * 513 4 except that the goods were to be kept for hire; and the difference is altogether in favor of the defendants in the present case.
In answer to this case it was observed by the counsel for the plaintiffs, that the cashier of the bank was trusted, and, therefore, the doctrine of Lord Kenyon did not apply. But if we are right in the principles before stated, he was not trusted in this business; neither he nor his principal, the bank, having any thing to do with the chest or cask, but to give it a place in the vault, and to lock it up, when the hours of business were over; and so the cashier must be considered like the servant in the case cited.
Some stress was laid, in the argument, upon the security taken by the bank of the cashier, for the faithful discharge of his duty. But we think it obvious, that nothing was contemplated in the security, but the official neglects of the cashier. The act of incorporation authorizes the bank to require bonds, in a sum not less than ten thousand dollars; and a bond was taken in that sum only. Now, considering this as one of the oldest banking companies, in one of the most wealthy towns in the commonwealth ; without doubt special deposits of a vast amount were from time to time received into the bank for safe-keeping, and a bond for ten thousand dollars could never have been taken, to indemnify against a possible loss of these.
Upon a view, therefore, of all the points in the case, and after a careful attention to the arguments and authorities, we are satisfied that, upon the special verdict, judgment must be entered for the defendants.
*416 We have to regret that two of our brethren have been so situated, as to be unable to afford us any assistance ; one being slightly interested when the action was commenced,‡ and the other having become interested by the death of a relative, since the argument, and before any consultation was had upon the cause. § It is a con- [ * 514 ] solution, * however, that the rest of us, having examined the cause with great care separately and together, all concur in the opinion which has been given.
This has been said to be a hard case on the part of the plaintiffs, whose testator confided a large amount of property to a place, as he thought, of perfect security, under the management of at least common prudence and skill; and, indeed, it is a hard case, as all cases are, where property is lost by violence or fraud. But it is not less hard upon many of the members of the corporation, who have, by the same wicked conduct, been deprived of their earnings and savings. All that can be done by the Court is to lament the common misfortune, and take care not to add injustice to hardship, by relieving one sufferer at the expense of others, unless the principles of law demand such interposition.

Costs for the defendants.

 4 Co. 83

 Cro. Eliz. 815, S. C.

 [But see Kettle vs. Bromsale, Willes, 118.—Story, Bailments, 49, 50, 51 —Noy Max. 43.—Ed.]

 [Story. Bailments 67.—Ed.1

 Putnam, J.

 Jackson, J.