## JAMINET, Respondent, v. AMERICAN STORAGE & MOVING COMPANY, Appellant.

### St. Louis Court of Appeals, December 13, 1904.

1. **PRIVATE CARRIER: Common Carrier.** A private person may by contract take on himself, in respect to articles which he agrees to transport, the degree of responsibility that rests on common carriers, that is, he may agree to be responsible for any loss except such as may be entailed by the act of God or the public enemy.

2. ————: **Bailee For Hire: Responsibility.** One who undertakes to move household goods from one residence to another in the same city is not a common carrier, but a private carrier or bailee for hire and responsible only for losses occasioned either by his own or his servants' negligence, unless by agreement he assumes additional responsibility.

3. ————: ————: ————: Such a bailee in the absence of a special contract is not responsible for damages to property which he is transporting, caused by the wanton act of a third person.

4. ————: ————: ————: **Warranty.** Where a private carrier or bailee for hire, in undertaking to carry the household goods of another, said he was responsible "and would move them with care and deliver them safely," this was not a warranty against every loss and did not enlarge the obligation of the carrier beyond that of a bailee for hire, so as to make him responsible for loss other than that caused by his failure to use care and skill.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher,* Judge.

REVERSED AND REMANDED.

*B. O. Davidson* and *A. R. Russell* for appellant.

(1) (a) The petition charges, under the common law, as a common carrier. (b) Also, that defendant "so carelessly and negligently conducted itself in the prem-

ises'' that the injury occurred. It was not claimed that defendant became liable as insurer by the terms of the contract of employment, but by reason of its being a common carrier it became such. The court in giving plaintiff's instruction 1 left nothing for the jury to find but that defendant was employed, the injury and amount of damage. Under the facts as alleged and proved, we contend this was error. Stanfield v. Phoenix Loan Assn., 53 Mo. App. 595; Schloss v. Wood, 17 Pac. 910. (2) There was a material issue as to whether defendant was a common carrier, for its liability is fixed by a different rule if it was not such, and this was a proper issue for the jury under proper instructions from the court. A private carrier is defined, ''A person who may or may not carry for another as he prefers.'' 2 Parsons on Contracts, 173; 6 Am. & Eng. Enc. of Law (2 Ed.), 242, 245, 247; Express Co. v. Backman, 28 Ohio St. 150; Fuller v. Bradley, 25 Pa. St. 120; Samms v. Stewart, 20 Ohio 69; Wood on Railways, p. 1571; Wharton on Negligence, sec. 545; Piedmont Mfg. Co. v. Railroad, 19 S. Car. 535; Fish v. Chapman, 2 Ga. 353; Fish v. Clark, 49 N. Y. 122. (3) Defendant claims that it is a private carrier, and as such was required to use only ordinary care, which it did. 1 Addison on Torts, sec. 607. On the question of negligence, we cite: Graney v. Railroad, 157 Mo. 666, 57 S. W. 276; Fuchs v. St. Louis, 167 Mo. 620, 67 S. W. 610; Skipton v. Railroad, 82 Mo. App. 134; Reed v. Railroad, 94 Mo. App. 371, 68 S. W. 364; Kane v. Falk Co., 93 Mo. App. 209; Holt v. Railroad, 84 Mo. App. 443; Reed v. Railroad, 94 Mo. App. 371.

*Joseph H. Zumbalen* for respondent.

(1) The defendant is responsible for the damage sustained on its express agreement to transport and deliver safely. Kettle v. Bromsall, Willes 118; Robinson v. Dunmore, 2 Bos. & Pul. 417; Fish v. Chapman, 2 Ga. 349; Bank v. Express Co., 93 U. S. 174; Davis v.

Smith, 15 Mo. 467; Harrison v. Railroad, 74 Mo. 364; Beattie v. Coal Co., 56 Mo. App. 230; Harvey v. Murray, 136 Mass. 377. (2) Under said agreement, the matters relied upon by the defendant constituted no defense, and its instructions were properly refused. (3) The instruction given on the measure of damages was proper and warranted by the evidence. Green v. Railroad, 128 Mass.-221; Railroad v. Burke, 55 Tex. 323; 1 Sedgwick on Damages (8 Ed.), sec. 251.

GOODE, J.—Action against defendant for the destruction of a mirror and the partial destruction of a portrait of the plaintiff while the defendant was moving the plaintiff's household goods from a residence on Laclede avenue in the city of St. Louis, to one on Cates avenue. The action originated before a justice of the peace. No pleading was filed by the defendant. The petition declares that in June, 1903, plaintiff delivered her personal property, including the articles mentioned, to the defendant at No. 4452 Laclede avenue, and the defendant agreed in consideration of certain charges, well and safely to move and carry said property to No. 5943 Cates avenue, and deliver the same to the plaintiff at the latter place in as good condition as when received by the defendant; but in disregard of its duty as a common carrier and in violation of its said agreement, it so negligently moved and carried said property that the portrait was torn and the mirror broken. There was judgment in the circuit court in her favor and an appeal to this court.

The articles damaged in moving were proved to have been delivered in good condition to the defendant at the house on Laclede avenue and there was testimony that the manager of the defendant company agreed in advance to take care of all the property in moving it and to be responsible for any damage. The testimony tends to show the mirror, which was of French plate glass, was broken in transit and that a

cheap one worth two or three dollars was substituted for it by the defendant. The portrait was injured in this way: When it was brought out of the house on Laclede avenue to be loaded on the wagon, the driver set it on the curbstone and leaning against the side of the wagon until he could get a quilt to wrap around it as a protection from injury. While it was resting there, a boy eight or nine years old, who lived in the neighborhood, came along holding a bottle in his hand and struck plaintiff's portrait in the face with the bottle, tearing the canvass and permanently injuring the picture, although it was afterwards skillfully repaired. Whether the boy was inspired by a spirit of pure mischief or by animosity against the plaintiff from previous disputes, is not known. The plaintiff testified regarding the contract with defendant's manager as follows:

"Witness: I merely told him that I had some valuable paintings and valuable things and he said he was responsible and would move them with care and deliver them safely.

"Q. He said he would deliver them safely? A. Yes, sir; for me.

"Q. You agreed upon the price? A. Yes, sir; I agreed to his price at the time."

Plaintiff's daughter gave this version of the contract:

"Q. Do you remember when your mother employed the defendant to do this moving for her? A. Yes, sir; the moving was on June 5th, and it was possibly a few days before that, possibly the last week in May that it was talked over; that I can't remember exactly.

"Q. Were you present when Langdale called? A. A part of the time I was present; I was very busy about household matters and my mother talked with him and I passed by the door and I said, 'You are in there?' and she said, 'Come in, will you?' and I said, 'Yes;' and she said, 'This is Mr. Langdale that moved us before,' and

I said, 'Will he be responsible to take care of all these things?' And I commented particularly on our old paintings, some curios and some valuable things we had, and Mr. Langdale spoke very nicely, and he cited people he had moved; and I said, 'We have a house full of old things that we value highly, portraits, furniture with glass and bric-a-brac, will you be responsible for it? And I mentioned a friend of ours, who, like ourselves, had these valuable paintings, and she had employed the art company to move them; and I said 'I think we had better do that.' Mr. Langdale said, 'We are thoroughly responsible; we move those valuable things every day;' and then my mother said to me, 'Why should we go to the extra expense of employing an art company?' and he said, 'Most assuredly.' As near as I can remember, that was the conversation.

"Q. Was there anything said by him to the effect that he would see that your pictures were moved safely? A. Everything; he gave his word for it.

"Q. You just state what was said. A. Yes, sir; he gave his word to move everything safely, and that they moved bric-a-brac, glass and all perfectly, and had an excellent packer who had given the utmost satisfaction."

For the plaintiff the court instructed the jury that if they found the defendant's agent had agreed with the plaintiff well and safely to move and carry her household goods and furniture between the respective residences and deliver them in as good condition as when received and that a painting and a mirror, or either of them, were injured or destroyed while in the defendant's possession, the verdict should be for the plaintiff. The court refused instructions requested by the defendant of the following purport: that if plaintiff knew of any special danger to her portrait from her neighbors' children while it was set face outward on the sidewalk, and failed to notify the defendant's servants of such danger, and while it was on the sidewalk it was intentionally

struck by a boy with whom the plaintiff was on unfriendly terms, the finding on that item should be for the defendant; that defendant was not responsible for damage to the portrait intentionally caused by the boy, unless the jury found the servants of the defendant were negligent in handling the portrait; that the defendant was charged with only reasonable care in handling the portrait; that is, such care as prudent men use in carrying on their business; and if defendant's servants handled it with that degree of care, the defendant was not responsible.

As to the mirror, the defense was made that the plaintiff accepted the mirror which was delivered to her, in lieu of the broken one, as satisfactory.

The chief contention of the appellant's counsel is that the court erred in assuming the appellant was a common carrier, instead of leaving it to the jury to say. This point is irrelevant; for the instructions did not make the appellant's liability depend upon its possessing the character and responsibility of a common carrier, but on a finding that it had agreed with the respondent, for a consideration, well and safely to move and carry respondent's household furniture and goods, and to deliver them to her again in as good condition as when received. As the case is presented here it is immaterial whether the appellant was a common carrier or not. It is true, as respondent's counsel says, that a private person may by contract, take on himself, in respect to an article which he agrees to transport, the degree of responsibility that rests on common carriers; that is a private person may agree to be responsible for any loss except such as may be entailed by the act of God or the public enemy; as no doubt he may, and, if he likes, may assume an even greater responsibility from which the act of God will not excuse him. [Robinson v. Dunsmore, 2 Bos. & Pil.; Fish v. Chapman, 2 Ga. 344.] It is plain the appellant company did not, by formal words, agree to assume the liability of a common

carrier in transporting the respondent's furniture. Nothing was said between the parties to that effect, nor, indeed was the subject of the legal duty and responsibility of a common carrier mentioned between them. Naturally it would not be. It is argued that the agreement imposed on the appellant a liability identical with what the law imposes on a common carrier; but it would be an idle task to settle that proposition. The important inquiry is as to the extent of the appellant's undertaking and the legal duty incumbent on it in consequence thereof. What did the appellant agree to do? There is a principle of law which may be stated in general terms as follows: When a party, by an absolute agreement, imposes the duty on himself of performing an act, he is not relieved of liability on his obligation by a subsequent event which renders performance impossible. [Davis v. Smith, 15 Mo. 467; Harrison v. Railroad, 74 Mo. 364; Beattie v. Coal Co., 58 Mo. App. 230.] The commonly-given reason for this rule is that the party bound might have protected himself by including in his contract an exception to his liability if the contingency occurred which prevented performance. The ultimate reason is that as there was no stipulation against the intervening impossibility, the party bound is presumed to have contracted with that risk in view and to have taken it. The rule has been given a very broad application, and it may be, in some instances, an unreasonable one. It is invoked by respondent's counsel as controlling the result of the present controversy; and if that position were well taken it would be important to define with precision the circumstances and situations in which an obligated party is answerable within the meaning of the rule, when performance of his undertaking becomes impossible. For no court has declared the rule to be a measure of public policy which must be enforced arbitrarily and without regard to the understanding of the parties. It is to be gleaned from judicial comments in controversies where the principle

of the rule was considered, that it is one of interpretation, relates to the intention of the parties to the contract and makes a defendant liable or not, according as the implication arises or not that the parties intended to excuse performance in case the given event should occur which, in fact, did occur and rendered performance impossible. [Hall v. School Dist., 24 Mo. App. 213; Dexter v. Norton, 47 N. Y. 65; Taylor v. Colwell, 3 Best & Smith's Rep. 26; Wharton, Contracts, sec. 300.] But is the rule mentioned the proper test of the appellant's liability? Liability on its part as a common carrier was excluded. It stands, therefore, as a private carrier (*locatio mercium vehendarium*), or bailee for hire, subject only to the duties and responsibilities of such a bailee, unless by agreement it assumed additional ones. Now what are the usual duties and obligations of such a bailee? To give the care, skill and diligence to the effort to safely carry and redeliver the bailed property to the bailor, that are commonly given by men in the same employment. Such a carrier, like other bailees for hire, is only responsible for losses occasioned either by his own or his servants' negligence. [Story, Bailments (9 Ed.), art. 4, sec. 457; Hutchinson, Carriers (2 Ed.), 37; United States v. Power, 6 Mont. 271; White v. Bascom, 28 Vt. 268; Varble v. Bigley, 14 Bush. (Ky.) 698.] It follows from the above doctrine and authorities that the appellant was not bound at all events to deliver the respondent's goods, including the portrait, in an undamaged state at her new home, by force of its general obligation as a private carrier for hire; and could have become thus bound only by a special term in the contract between the parties—some definite stipulation or warranty, superadding to the ordinary duty and responsibility of a private carrier a responsibility akin to that resting on a common carrier. Prima facie, the appellant was liable, as the portrait was bailed to it in good condition and was returned damaged. But the

proof is that the damage happened without the fault of appellant's servants and in a way that no man could have foreseen or prevented. That makes a good excuse for a bailee not bound by a special undertaking. [Claflin v. Meyer, 75 N. Y. 260; Stewart v. Stone, 127 N. Y. 500; Mills v. Gilbreth, 47 Maine 320.] But it is contended the appellant stipulated specially for the safe carriage and redelivery of respondent's property in as good condition as when received by it. As to the latter words ("as good condition as when received by it") we find no testimony that they or their equivalent were uttered by the parties when negotiating the contract, and in leaving the jury to find there was a contract containing them the instruction to the jury went beyond the evidence. The most that was testified to against the appellant was that its manager agreed to move and deliver the goods safely and to be responsible for them. The position taken in support of the judgment below is that the agreement between the parties as actually made, covered the injury to the portrait by the mischievous boy, amounted to a warranty that the property to be moved would be restored to respondent uninjured and made the appellant an insurer, not only against the negligence of its servants, but against the lawlessness of third parties; against everything, in truth, except the act of God. We see no reason why, from respondent's point of view, the latter exception should be made, unless it is for the purpose of enforcing the analogy of the appellant's liability to that of common carriers. If the appellant warranted a safe return of the goods in the broad sense insisted on, there is nothing to show the act of God, or a natural calamity, was any more understood to be excepted than the tortious act of a stranger.

We have quoted the testimony of the plaintiff and her daughter, which is all the testimony for respondent going to prove what the terms of the contract with the appellant company were. If a warranty that the goods

should be carried to the respondent's new residence in safety and there delivered to her in as good condition as when received, can be deduced by fair inference from their testimony, the appellant company is responsible. A warranty is commonly defined as a stipulation or covenant in a contract, intended to be a part of the agreement between the parties, but collateral to its main purpose. [Flint-Walling Co. v. Ball, 43 Mo. App. 504; Bouvier's Law Dict. "Warranty."] Without being technical or precise about the definition of a warranty, we may safely say that it must be a stipulation in a contract by which one party binds himself to answer to the other in a certain regard. Like any other stipulation it consists in an agreement between parties; a meeting of minds as to a particular matter. Now, if the appellant warranted the safe carriage of the portrait, it can not escape liability for its loss though caused by the wanton and surprising act of a stranger. The case, therefore, comes down to the question of whether the testimony justifies the inference that appellant contracted against any injury to the respondent's portrait and other property, except such as might happen by the negligence or unskillfulness of its employees. Can it fairly be said, on any aspect of the evidence, that appellant contracted against injury by the malicious act of a third person? Was the scope of its agreement larger than the ordinary undertaking of a person who assumes to move valuable property; that is, an undertaking to exercise skill and care? To our minds the respondent's own testimony furnishes a conclusive answer to this inquiry. She swore the appellant's manager Langdale, with whom she made the contract, said he was responsible "and would move them (the goods) with care and deliver them safely." Plainly, the only undertaking by Langdale to be gathered from that statement, was for the careful moving and safe delivery of the property; that is, he assumed responsibility for care in moving and for safe delivery as far as ap-

pellant's servants were concerned; not for the safety of the goods in any event, including the chance of malicious destruction by an outsider. The daughter went into the conversation between her mother and Langdale in detail. It is apparent from the daughter's testimony that Mrs. Jaminet was relying on a previous experience with Langdale, as she called her daughter's attention to the fact that he had moved them before. The daughter asked if he would be responsible and take care of all the things, commenting particularly on the paintings, curios and other precious articles, and saying she thought they had better employ an art company. Langdale said "we are thoroughly responsible; we move those valuable things every day." That remark obviously was made to show the appellant was expert in moving and financially responsible in case of loss. Again, the witness was asked if he said anything to the effect that he would see the pictures and mirrors were moved safely. She answered, "Everything; he gave his word for it." She was then told to state exactly what Langdale said and answered: "He gave his word to move everything safely and that they moved bric-a-brac and all perfectly, and had an excellent packer who had given the utmost satisfaction." Unmistakably, that language shows the thought in the minds of the parties related to the skill and care the appellant company possessed and would use in moving the property and delivering it at the new residence. Langdale spoke of the skill of his packer, saying they (the company) moved fragile articles perfectly and the packer had given satisfaction. In our judgment no broader contract is justly deducible from what passed between the parties than the ordinary one of a bailment for hire; the undertaking of a private carrier to use care and skill. There was no warranty against every loss and no thought in the mind of either party of such a loss as happened, or of any loss from extraneous causes. The true meaning and obligation of the undertaking the tes-

timony goes to show the appellant company assumed, has been expounded by judges in considered cases and by commentators too. In Story on Bailments, sec. 457, after the statement that a private carrier will be held liable for any loss within the scope of his contract, this statement follows: "But even an express undertaking by a private person to carry goods safely and securely is but an undertaking to carry them safely and securely, free from any negligence of himself or his servants; and it does not insure the safety of the goods against losses by thieves or any taking by force."

In Hutchinson on Carriers, the same doctrine is declared in much the same language, it being said of a private carrier:

"He may stipulate that he shall in no event be liable except for fraud or its equivalent. So he may by special contract increase his liability beyond that which the law would have otherwise imposed; as where the owner of the goods found fault with some of the appliances of the carrier which he was about to use in moving the goods, and the latter replied, 'I will warrant the goods shall go safe,' and the owner upon this assurance permitted him to go on with them, and the goods were in fact injured from the very defect of which the owner had complained, it was held that the carrier, could be held upon his special undertaking and that the words used by him to the owner of the goods amounted to a warranty that the goods should go safely. Said the court, per CHAMBRE, J., 'the defendant is not a common carrier by trade, but has put himself into the position of a common carrier by his particular warranty.' So in Coggs v. Bernard, it was considered, notwithstanding Lord Coke's opinion to the contrary in Southcote's case, that in a gratuitous bailment, the promise of the defendant to lay the goods down safely introduced a special term into his contract which increased his liability. But even an express undertaking by a private carrier to carry goods safely and securely is but an un-

dertaking to carry them safely and securely, free from any negligence of himself or his servants. In other words, it is a mere contract for the observance of due care and does not insure the safety of the goods against losses by thieves, by robbery, or by unavoidable accidents; and does not give rise to that extraordinary liability which belongs to the common carrier. The private carrier may, however, by express terms warrant the safety of the goods and thus become liable to the same extent as the common carrier, as every bailee to whom goods are intrusted may undoubtedly for a consideration insure their safety. But an express warranty as to a particular risk will not be extended to a different one; as where the carrier expressly assumes the risk of breakage, he will not be liable for a loss by accidental fire. Nor will an express exclusion of a certain risk be construed as an assumption of all risks not excluded. But all the contracts, either to increase or lessen the responsibility of the bailee, must be clear and explicit; for extraordinary liabilities will not be imposed upon him, nor will he be released from his legal and reasonable obligations, to the prejudice of the bailor, by mere inference.'' [Hutchinson, Carriers, (2 Ed.), sec. 40.]

We have said that the obligation of a private carrier for hire is identical with that of any other kind of bailee for hire, and is to exercise reasonable care and skill in preserving the property intrusted to him. Now a case arose in Massachusetts on a special deposit of money with a bank, receipted for by the cashier in these words: ''Left at Essex Bank for safe-keeping.'' [Foster v. Essex Bank, 17 Mass. 478.] Part of the gold was fraudulently abstracted by the cashier and in the action brought by the depositor, an inquiry occurred concerning the extent of the bank's undertaking. It should be stated that the bailment was held to have been a gratuitous one and, therefore, the bank was answerable only for gross neglect or fraud; but as the depositor's coun-

sel asserted it was for hire, the court went into the question of the bank's responsibility under the contract evidenced by the receipt, granting that the bailment was for a price and that the obligation imported by the receipt was within the scope of the cashier's authority. The opinion points out that Lord COKE's doctrine that the bare acceptance of goods to keep them safely makes a bailee liable, had been rejected by the courts and that according to Sir William Jones, a depository is liable only for neglect on a special undertaking to keep safely. The text of Blackstone is referred to as authority for the principle that if a bailee agrees specially to keep goods "safely and securely he is bound for all perils and damages that may befall them for want of the same care with which a prudent man would keep his own." This statement of the principle is thus indorsed by the Supreme Court of Massachusetts:

"And this certainly is the more reasonable doctrine; for the common understanding of a promise to keep safely would be, that the party would use due diligence and care to prevent loss or accident; and there is no breach of faith or trust, if, notwithstanding such care, the goods should be spoiled or purloined. Any thing more than this would amount to an insurance of the goods; which can not be presumed to be intended, unless there be an express agreement, and an adequate consideration therefor."

The opinion then discusses what the result would be on the theory that the bailment was for hire:

"If we proceed one step further in the gradation of liabilities, we shall discover every legal principle which can by possibility effect this cause, considered as founded on a contract of bailment. It was urged by the plaintiff's counsel that this is not a naked bailment, but is accompanied with an advantage from the use of the property, or the credit derived from the custody of it; and that this ought to be viewed in the light of a reward, so that the case will be brought within the princi-

ple of bailment for hire or reward. If it be so, the principle applicable to this species of bailment goes no further than to make the bailee liable in case of ordinary neglect; so that if he shows that he used due care, and nevertheless the goods were stolen, he would be excused. This is the doctrine of Sir William Jones and was the opinion of Lord KENYON in the case of Finnucane v. Small, cited in the argument; which, though a *nisi prius* decision, is satisfactory evidence of the law as two very eminent sergeants acquiesced in his opinion.

"And this is also reasonable, for one who takes goods into his warehouse, to keep for a stipulated price, does not intend to insure them against fire or thieves. His compensation is only in the nature of rent; or if anything beyond that, only for the vigilance of a man of common prudence. If he locks and fastens the warehouse as other prudent people do, and thieves break through and steal, he ought not to be accountable; if he leaves the door or windows open he ought to be. The common sense of mankind must acquiesce in these reasonable provisions of the law; and without doubt the common dealings of men are governed by them, as principles of natural justice, without a knowledge of the positive law."

The case of Belden v. Ames, 17 Barb. (N. Y.) 513, was on a charter-party by which certain boats had been let to the defendant for use during two months, to be returned by the charterer after their use "in as good condition as they now are, with the exception of the ordinary use and wear." It was held on a review of the decisions, that those words did not enlarge the bailee's common law obligation, which extended only to the exercise of reasonable care. In Robinson v. Dunmore, 2 Bos. & Pull. 416, the defendant, a private carrier, was held responsible for goods damaged in harvest by rain. There was a particular warranty as follows: "I have plenty of sacks and I will warrant the goods shall go safe." It was thought the warranty gave the defend-

ant the character of a common carrier in the special transaction, as the plaintiff had objected to the smallness of the tarpaulin with which it was proposed to cover the goods. Whereupon the defendant gave the warranty against them getting wet.

The decision in Stewart v. Stone, 127 N. Y. 500, was rested on the principles above stated. That plaintiff had delivered milk to the defendant's factory, the defendant undertaking to manufacture butter and cheese from it, sell those products and distribute the proceeds according to the agreement. The factory was destroyed by fire and a great quantity of plaintiff's milk, butter and cheese lost. In an action for damages the Supreme Court of New York treated the contract as one of bailment involving the performance of services by the defendant for the benefit of both parties, and held that the defendant was bound to exercise ordinary care to protect the subject of the bailment and was liable for any loss occasioned by a failure in that regard. It was urged that as the defendant had agreed absolutely to make butter and cheese from plaintiff's milk and pay plaintiff the proceeds, the defendant was liable if not negligent. This argument was rejected on the ground that the matter of the agreement was such that the parties should be held to have contemplated the possibility of a failure to perform on account of the destruction of the milk or the factory in which it was stored; that necessarily there was an implied condition so qualifying the defendant's undertaking as to relieve him from his obligation if performance became impossible without his fault..

Cases can be found in the books which are inconsistent with those cited above and wherein the judgments were on contrary principles. Such, possibly, is the old case of Kettle v. Browngall, Willes 121, wherein it is said that if the goods be delivered to one to keep safely, the depository is liable if robbed of the goods; also Drake v. White, wherein the defendant as pledgee

was held on an agreement to redeliver the pledge or its equivalent in money, the pledge having been destroyed by fire; also Harvey v. Murray, 136 Mass. 377, where the bailee agreed regarding the bailed article "to return it in as good order as when received, customary wear and tear excepted," the article having been destroyed by storm. Such rulings seem to be opposed to some of the precedents we have cited. The first of those cases went off on a question of pleading and did not decide the proposition, which was announced as a dictum. In the second case the pledgee stipulated in writing to restore the article or pay its equivalent, and this was held to cover a loss without his fault. In the third case the stipulation was written and purported to bind the bailee for all damage except ordinary wear. The last two cases look inconsistent with the doctrine declared in Foster v. Essex Bank, that a contract to insure can not be presumed against a bailee unless there be an express agreement to that effect. As a possible ground of distinction between, and reconciliation of, the cases, we have thought of this notion: that when property is bailed for hire to a party who is to do something with it for the bailor, like transporting it, an agreement to do so safely is referred to the task to be performed and held to mean no more than that skill and care will be devoted to that task; but when the bailee is not employed to do anything with the property, yet nevertheless binds himself to return it safely, the obligation is taken to be general and without exception, as none is named and there is no particular undertaking in regard to the property to which the obligation to return in safety can be referred and confined. We are not sure that his notion is valid or will suffice to explain and reconcile all the cases. It could have no reference, of course, to controversies where the essence and purpose of the agreement were the employment of a bailee to care for property, he assuming responsibil-

ity, not only for his own care and skill, but for losses due to other causes; as where a trunk or valise is left with a checking office. We wish the law of this controversy was more certain; but after devoting considerable time and attention to it, our opinion is that the case was erroneously instructed, and that, with the question of the appellant's liability as a common carrier eliminated, the cause must be governed by the law of bailments and the responsibility of the appellant company tested by the obligation of an ordinary bailee for hire. It is patent on the face of the conversation between appellant's manager, Langdale, and the respondent and her daughter, which conversation formed the contract between the parties, that the respondent was solicitous about the care and skill with which her goods would be handled and Langdale was assuring her on that point. Nothing was shown which fairly can be interpreted in the light of similar cases, as an assumption by Langdale of any risk of loss or injury to the goods from the unsuspected malice of a stranger, or of any risk except from the neglect or lack of skill of appellant's servants. The portrait was injured solely by the mischievous act of a boy who chanced to go by while the picture was being prepared for safe carriage in the appellant's van. We hold that the appellant was not responsible for that loss on the showing made.

No question has been presented on this appeal as to appellant's responsibility for the mirror.

It was erroneous, we think, to refuse the instruction requested by the appellant, that it was charged with reasonable care in handling and removing the oil portrait, as that was the true test of its duty.

The judgment is reversed and the cause remanded. All concur.